**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **JOHN MURPHY, LEON HUBBARD** | § | |
| **CATHERINE MOORE, KENDRIA** | § | |
| **NEWSOME, JAMES SENEGAL** | § | |
| **DAVID JOUBERT and WILDA** | § | |
| **JOHNSON,** | § | |
| | § | |
| *Plaintiffs,* | § | **CIVIL ACTION NO. H-05-02883** |
| | § | |
| **v.** | § | |
| | § | |
| **MICHAEL CHARLES BUTLER and** | § | |
| **HARRIS COUNTY, TEXAS,** | § | **JURY DEMANDED** |
| | § | |
| *Defendants.* | § | |

---

### PLAINTIFFS' FIRST AMENDED COMPLAINT

---

TO THE HONORABLE UNITED STATES DISTRICT JUDGE:

Plaintiffs **John Murphy, Leon Hubbard, Catherine Moore, Kendria Newsome, James Senegal, David Joubert** and Wilda Johnson all former deputy constables with Harris County's Precinct Seven Constable's Office under Defendant Michael Butler, file this Original Complaint to recover for the unlawful conduct of their former employer, Defendant **Harris County, Texas** and former Precinct Seven Constable, Defendant **Michael Charles Butler**.

### A.
### PARTIES, RESIDENCE & SERVICE OF PROCESS

1.      Plaintiff **John Murphy** ("Murphy") is an individual citizen of the state of Texas who resides in Harris County, Texas.

2.      Plaintiff **Catherine Moore** ("Moore") is an individual citizen of the state of Texas who resides in Harris County, Texas.

- 1 -

3.      Plaintiff **Kendria Newsome** ("Newsome") is an individual citizen of the state of Texas who resides in Harris County, Texas.

4.      Plaintiff **Leon Hubbard** ("Hubbard") is an individual citizen of the state of Texas who resides in Brazoria County, Texas.

5.      Plaintiff **James Senegal** ("Senegal") is an individual citizen of the state of Texas who resides in Harris County, Texas.

6.      Plaintiff **David Joubert** ("Joubert") is an individual citizen of the state of Texas who resides in Fort Bend County, Texas.

7.      Plaintiff **Wilda Johnson** ("Johnson") is an individual citizen of the state of Texas who resides in Harris County, Texas.

8.      Defendant **Michael Charles Butler** ("Butler") is an individual citizen of the State of Texas who resides in Harris County, Texas.  Defendant Butler may be served with process by serving him personally wherever he may be found, or at his residence at 2903 Linkwood Drive, Houston, Texas 77025-3811, or at his place of employment at Harris County Constable's Office, Precinct One, 1302 Preston, 3rd Floor, Houston, Texas 77002.

9.      Defendant **Harris County, Texas** ("County" or "Harris County") is a municipality organized and existing under the laws of the State of Texas.  Harris County may be served with process by serving its County Judge, Robert Eckels, at 1001 Preston, Suite 911, Houston, Texas 77002.

**B.**
**JURISDICTION AND VENUE**

10.     The Court maintains federal question subject matter jurisdiction over this matter because it arises under a statute of the United States – *i.e.*, 42 U.S.C. § 1983 and the First Amendment to the United States Constitution.  *See* 28 U.S.C. § 1331.

11.     Venue is proper in the Houston Division of the Southern District of Texas under 28 U.S.C. § 1391(b)(1-2) because Defendants reside in the Houston Division of the Southern District of Texas and because a substantial part of the events giving rise to the causes of action occurred in the Houston Division of the Southern District of Texas.

### C.
### FACTS AND CONDITIONS PRECEDENT

12.     In March 2003, Precinct Seven Constable Perry Wooten stepped down from his position because of a criminal conviction of theft by a public servant.  Harris County Commissioner's Court appointed Defendant Butler as the interim constable in July 2003 until the next general election could be held after Butler promised he would not seek the post in the election.  Nevertheless, Butler then decided to run for the post and announced to the Constable's office staff in late September 2003 or early October 2003 that he intended to run for the Constable's position.  Butler then filed for his candidacy as a democrat at some point prior the primary election, which was scheduled for March 19, 2004.  The primary drew fifteen democratic candidates and was a hotly contested race.  Butler instructed his deputies to engage in unfair and possibly illegal campaign tactics, such as monitoring the activities of the other deputy constables in the office to see which of the fifteen candidates they were supporting and requiring deputies, while on county time, to canvass the area with Butler's campaign literature.  On March 9, 2004, the democratic primary was held, and Butler and May Walker garnered enough votes for a run off.  On April 13, 2004, the runoff election occurred, and Walker beat Butler by a huge margin.  Butler remained in office as the interim constable, however, until well after November 2, 2004, which was the general election in which May Walker defeated her republican opponent, James Shipley.

13.   **Plaintiff John Murphy.**   On or about March 9, 2004, the night of the primary election that Butler lost, Murphy and Wilda Johnson had been seen by Butler's cronies coming out of the headquarters of Monroe Wilkerson, an opponent of Butler's who was running for the same position.   Murphy had heard from several co-workers that Butler had asked certain staff members to watch and see who was supporting other candidates.   On or about April 18, 2004, just five days after Butler lost the democratic runoff election to fill the open seat of deposed Precinct Seven Constable Perry Wooten, Butler called a mandatory meeting of the staff at Precinct Seven.   During the meeting, Butler thanked those who supported his candidacy, stated that he knew who supported him and who had not supported him, and that he felt that if he had been given 100% support from his existing staff, he probably would have won the election. Shortly thereafter, Butler fired John Murphy, a long-time deputy constable for Precinct Seven who had been widely praised for his job performance through his tenure.    At the time of his termination, Murphy had been earning $32,000 annually.   Since that time, and despite extensive efforts to replace the employment he lost, Murphy has been unable to secure a local peace officer's position.

14.   **Plaintiff Kendria Newsome.**   Four to five months before the primary election in January February, Butler called Newsome into his office and said that he had learned that Newsome had a party at her house, that one of his primary opponents was there, and why was Butler not invited.   When Newsome challenged Butler's characterization of the event as a "party," Butler responded with a question of why Newsome had his opponent's campaign sign in her yard.   A couple of weeks later, Butler accused Newsome of having in her home garage the campaign sign of his opponent, James "Smokey" Phillips.   Although Newsome denied it, she did in fact have the sign in her garage.   After this, her relationship with the Constable's office began

to go downhill.  For no apparent reason, Newsome was transferred from the toll road patrol to searching for truants (known as the ASAP patrol).  The reason this transfer occurred was because Butler was trying to force Newsome to quit.  The ASAP patrol was headed up by Kenneth Smith, a sergeant that Newsome had earlier complained about with respect to his treatment of female officers.  After the transfer, Newsome began to receive "write ups" for alleged rules infractions that either (a) did not occur or (b) were not enforced against other deputies.  Butler fired Newsome on June 1, 2004 allegedly because he "lost confidence" in her.  However, Butler had been overheard to say prior to terminating Newsome that as soon as he won the election, he was going to fire Newsome, Plaintiff Hubbard, and other individuals because they were not supporting his candidacy.  At the time she was fired, Newsome was earning approximately $3,000 per month.  Although Newsome was rehired by Precinct Seven Constable May Walker, she was unemployed for seven months, despite having acted reasonably to locate and maintain substantially equivalent employment.  During that time, Newsome was also damaged through a loss of insurance benefits and lost the equivalent of four years in the county retirement plan.

      15.    **Plaintiff Leon Hubbard**.  Plaintiff Leon Hubbard has been employed with the Harris County Precinct Seven Constable's office as a deputy for many years.   In November 2004, Hubbard reviewed his personnel file to determine if any false documents had been placed in the file, and Hubbard found nothing.  Two days later, Hubbard received a call on the radio from his direct supervisor, Sgt. Michael Hartley, who asked Hubbard to meet with him before Hubbard got off work that day.  Hubbard met with Hartley as they sat in parked units at MLK Street and Beltway 8.  During the meeting, Hartley told Hubbard that Hubbard was being transferred (a) to the southwest side; and (b) from the 7:00 a.m. to 3:00 p.m. shift to the 3:00 p.m. to 11:00 p.m. shift.  When Hubbard asked why he had been chosen for transfer instead of a

deputy with less seniority, Hartley simply said that Butler had ordered the transfer and that Hubbard was being transferred.  When Hubbard asked when the transfer would start, Hartley said "three days from now."  Hubbard said "okay" and mentioned that he needed to get someone to take care of his ill wife during the 3-11 time frame, and that he thought he could find someone in that period of time.  The meeting ended, and Hubbard went home.  Apparently, Hubbard's decision to accept the transfer as opposed to quitting (which is what Butler really wanted) inspired Butler to speed his retaliatory conduct.  A couple of hours after the Hartley/Hubbard meeting, Hartley called Hubbard's home telephone and said that Butler wanted his badge.  When Hubbard asked why, Hartley said, "you were insubordinate."  Hubbard asked Hartley to identify to whom he was insubordinate.  Hartley again said that it did not matter, "it has already come down," and that Butler wanted his badge.  Hubbard said "well, tell him to come over here and get it."  A short time later, Hartley and Jerry Lawrence came to Hubbard's house and handed Hubbard a letter of termination.  Hubbard threw his badge on the front lawn and told them to leave his property.

16.     On January 1, 2005, Precinct Seven Constable May Walker rehired Hubbard and promoted him to Sergeant position in the Civil Division.  Hubbard was earning approximately $39,000 annually at the time he was fired, and began earning $51,000 annually upon his rehiring. During the time he was fired, however, Hubbard lost approximately six weeks of wages, his accrued vacation time, and because he lost his seniority, his life insurance premiums have tripled.

17.     **James Senegal.**  Senegal started work with Precinct Seven's Constable's office in June 2003 as a reserve deputy and began riding with Plaintiff Murphy.  Approximately three months later, Captain Mike Scott, who did not like Murphy, precluded Senegal (or any other

deputy) from riding with Murphy.  Senegal then began riding with Deputy Walker.  Senegal was hired full time in June 2004.  Prior to the primary election in March 2004, Butler began requiring deputies to go to his campaign headquarters to work on the campaign, and because he would require deputies to sign in at the headquarters, Butler knew who was participating in his campaign and who was not, and he mentioned this fact to Senegal on more than one occasion.  Senegal, however, did not go to Butler's campaign headquarters, did not campaign for him, and not pass out his signs and as a result, Butler knew that Senegal did not support his candidacy.  Captain Mike Scott did support Butler.  In fact, Deputy Chris Kerr told Senegal that he overheard Scott say that he was going to give Senegal a few months and then was going to "burn" him.

18.     In July 2004, the Constable's office allegedly got a complaint regarding Deputy Senegal.  Specifically, there was a traffic stop in which Senegal stopped a motorist for suspicion of DWI.  The driver admitted to being intoxicated, but said that he was about to go into the Army and a conviction would prevent that.  Because there was a wrecker driver there, Senegal allowed the suspect to negotiate a deal with the wrecker driver to tow the suspect and his car home.  A couple of days later, the suspect allegedly phoned in a complaint about the incident.  Butler then called a meeting with Senegal.  Also present were Capt. Mike Scott, Curtis Thompson, Jerry Lawrence and Sgt. Edward Scott.  Butler asked Senegal to tell him what happened but did not allow Senegal to finish his account of the incident.  Butler screamed, "Aw hell no, hell no, I cannot have you working for me with this kind of shit."  Butler then gave Senegal a chance to resign.  When Senegal attempted to defend himself and point out the Constable's policies that demonstrated that no infraction had occurred, Butler yelled "are you trying to come in my office and tell me some shit about policies?  I can end your fucking law enforcement career right now.  You know what I am going to do?  I am not going to fire you today.  I am going to give you due

process."  Butler then looked at Captain Scott and asked how long the investigation would take to get wrapped up.

19.     The following Tuesday, Senegal met with Curtis Thompson and Capt. Jessie Mack.  Thompson said "Well, Senegal, well we completed this investigation, and it is not looking to good.  These are your two options.  Resign or we fire you and your record goes up to TCLEOSE."  When Senegal attempted to take a few minutes to decide what to do, Thompson said "well, we made the decision for you – you are fired."  Butler kept his promise to ruin Senegal's law enforcement career.  Butler sent the form to TCLEOSE which falsely stated that the reason for Senegal's termination was "official misconduct."  When Senegal was fired in August 2004, he was earning $17.19 per hour for 40 hours a week.  He lost his health insurance benefits.  Senegal was unemployed for one month and got his old job back as an investigator at Fiesta earning $10.50 per hour.

20.     **<u>Catherine Moore</u>**.  Moore began with Harris County Precinct Seven's Constable's Office as a deputy constable in September 2000.  During the election period, Butler would harass Moore for refusing Butler's demands that Moore help him in his campaign by: (a) calling her into the office to yell at her for minor things; and (b) having his cronies follow her. When Moore challenged the practice of having deputies follow her, Butler would say that the deputies were "just doing their job."  Butler unlawfully fired Moore on or about October 8, 2004, ostensibly for having a campaign sign in the trunk of her patrol car for May Walker.  In fact, Moore had obtained two signs from Deputy Newsome, who Butler had already unlawfully fired and who was working on May Walker's campaign.  After putting one sign in her yard, she accidentally left the other in the trunk of her patrol car.  The next morning, Moore went into the office and took an exam to recertify herself as an operator of the breathalyzer machine and the

NCIC/TCIC database.  While she was there, Curtis Thompson and Lt. Jerry Lawrence went into the trunk of her patrol car and found the sign.  Curtis Thompson then called her during the exam and said that Butler wanted to see her.  Moore went into Butler's office and he falsely said that "a male had anonymously called me and told me that you put a campaign sign out on duty and you are terminated."  When Moore caught Butler in the lie by stating, "how can I put sign out if I still have it," Butler retorted, "well, you had the sign in your patrol car and that is against county policy."  This seemed odd to Moore, because Butler had in the past given deputies **his** campaign signs to put out on duty, and no disciplinary action ensued against them.  Moore was out of work from October 8, 2004 until January 3, 2005 when she was rehired by May Walker.  At the time she was fired, Moore was earning approximately $36,000 annually as a deputy.

21.     **David Joubert.**  David Joubert began working with Harris County's Precinct Seven Constable's office in May or June 2002 as a warrant detective.  In late September 2003 or early October 2003, Butler announced to the office staff that he intended to run for the Precinct Seven Constable's position.  Shortly after hearing this, Joubert commented to his co-worker, Oletha Wells (a confidant of Butler), that Joubert did not intend to support Butler in his campaign.  Within approximately four weeks after making this statement, Butler first asked Joubert to resign his employment, and when Joubert refused, Butler fired Joubert on October 28, 2003 for an alleged violation of office "policy" that did not exist and was in fact contrary to the training that Ms. Wells had provided Joubert during his employment with the office.  The reason for the termination was false and was nothing more than a sham to cover up unlawful retaliation in violation of Joubert's rights under the First Amendment.  Due to this unlawful termination of employment, Joubert was out of work from October 28, 2003 until January 2005 when he was rehired by Constable May Walker.  At the time he was fired, Joubert was earning approximately

$34,000 annually.  In addition, Joubert suffered $1,000 in damages for having to pay for medical care that would have been paid for his county- provided health insurance but for the unlawful termination.  Finally, Joubert suffered damages in the form of loss of retirement benefits in the county retirement system.  To add insult to injury, Joubert had to begin drawing benefits out of his county retirement plan to be able to meet daily living expenses, which will in turn significantly decrease the amount he otherwise would have enjoyed but for the unlawful termination.

22.    **Wilda Johnson.**  Wilda Johnson began working for Harris County's Precinct 7 Constable's office in July 2000 as a secretary/clerk at the Gang Resistance Education and Training division ("GREAT" division) earning a little under $30,000 annually.  Johnson did not support Michael Butler's candidacy for constable; she supported Monroe Wilkerson in the democratic primary.  However, because Johnson feared she would be fired if she openly supported a candidate other than Butler, she supported Wilkerson covertly by having her daughter, husband and friend hand out Wilkerson flyers and talk to people about voting for Wilkerson.  On or about March 9, 2004, the night of the primary election that Butler lost, Wilda Johnson and Plaintiff Murphy had been seen by Butler's cronies coming out of Wilkerson's campaign headquarters.  On May 3, 2004, just twenty days after Butler lost the democratic primary runoff election to May Walker, Butler fired Johnson for an alleged violation of office policy.  Specifically, Butler accused Ms. Johnson of accessing pornographic websites on her laptop and then, when Ms. Johnson denied it, he accused her of knowingly letting someone else named "Kevin" use the computer for that purpose.  When Johnson denied it, Butler became irate, screaming at her that "you know how it got on there!  You are lying!"  Of course, this was a disconcerting conversation, because Butler had never spoken to Johnson prior to this as she

worked at a different location than the main headquarters for Precinct 7.  When Johnson refused

to confess to something that she did not do, Butler said "I can't have someone like this working

for me.  You are fired."  This reason for termination was nothing more than a sham to cover up

unlawful retaliation in violation of Johnson's rights under the First Amendment.  Due to this

unlawful termination of employment, Johnson was out of work from May 3, 2004 until January

2005 when she was rehired by Constable May Walker as a dispatcher.  At the time she was fired,

Johnson was earning a little under $30,000 annually.  Finally, Johnson suffered damages in the

form of loss of retirement benefits in the county retirement system.

23.     At all relevant times, Butler was a final policymaker for Harris County, Texas as

it relates to the decisions challenged in this Complaint.  All conditions precedent to the assertion

of the causes of action herein have been performed or have occurred.

## D.
## CAUSES OF ACTION

### CAUSE OF ACTION NO. 1
**First Amendment Retaliation Against Harris County, Texas and Butler (In His Individual Capacity) Under 42 U.S.C. § 1983**

24.     Paragraphs 1 through 23 of this First Amended Complaint are incorporated herein

by reference as if fully set forth below.

25.     As of at least July 2, 1998 (but for at least twenty years prior to that), it was

clearly established law that a municipality could not legally discharge, discipline, or otherwise

retaliate against a public employee for exercising their First Amendment right to free speech and

political association when that public employee's speech relates to a matter of public concern

and their interest in commenting on that matter outweighs "the public employer's interest in

promoting the efficiency of the public services it performs through its employees."  *Brady v.*

*Fort Bend County*, 145 F.3d 691, 704 (5th Cir. 1998) (internal quotation marks and citations

omitted).  Political speech regarding a public election lies at the core of matters of public concern protected by the First Amendment.  *Elrod v. Burns*, 427 U.S. 347, 356, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Brady*, 145 F.3d at 705; *Vojvodich v. Lopez*, 48 F.3d 879, 885 (5th Cir. 1995).  Moreover, deputy "beat" constables and secretaries like Plaintiffs do not and never did occupy sensitive "confidential" or "policymaking" roles that would subject them to lawful patronage dismissals.  *Brady*, 145 F.3d at 709-10.  At various times during 2003 and 2004, Plaintiffs exercised their constitutionally-protected right to free speech and political association under the First Amendment to the United States Constitution when they either (a) chose not to support Butler's candidacy, and/or (b) supported a political candidate different than Butler and engaged in free speech regarding matters of public concern – *i.e.,* their opinion as to the candidate whom Plaintiffs felt should serve as the elected Constable for the citizens of Harris County's Precinct Seven.  To the extent that this speech conflicted with Plaintiffs' role as public employees, Plaintiffs' interest in commenting upon such matters outweighed the interest of Harris County, Texas or Butler in promoting the efficiency of the public services each performed through its employees.

26.     Butler acted under color of state law when he personally decided, in his official and individual capacity and pursuant to official municipal policy or custom and/or through his position as final policymaker for Harris County, Texas in all relevant aspects, to terminate Plaintiffs' employment with Harris County, Texas in retaliation for Plaintiffs' decision to support other candidates for the elected position of Constable for Harris County Precinct Seven.  Alternatively, this decision to terminate Plaintiffs' employment with Harris County, Texas was made by decision-makers who possessed final authority to establish municipal policy with respect to the decision to terminate Plaintiffs' employment.  This municipal policy or custom (or the single

decision of Harris County's final policymaker(s) in this area) was the cause in fact of Plaintiffs' damages for the violation of Plaintiffs' First Amendment rights.  Plaintiffs' decision to either (a) not support Butler; and/or (b) support other candidates for the position of Constable for Harris County Precinct Seven were a substantial or motivating factor in the termination of their employment with Harris County, Texas.

27.     Butler and Harris County's unlawful retaliation against Plaintiffs for the exercise of their First Amendment rights caused Plaintiffs to suffer compensatory damages.  Specifically, Plaintiffs suffered past and future lost wages, inconvenience, humiliation and loss of enjoyment of life for which Plaintiffs now seek recovery from Defendant Harris County, Texas and Defendant Butler in his individual capacity, as provided by 42 U.S.C. § 1983.  Plaintiffs also seek the equitable remedies of back pay and lost fringe benefits, front pay in lieu of reinstatement (which Plaintiffs assert is not feasible), lost future benefits (such as the value of Plaintiffs' retirement accounts and seniority benefits had they remained employed with Harris County, Texas) as well as an award of attorney's fees as provided by 42 U.S.C. § 1988.

28.     Because Defendant Butler acted with evil motive and with reckless or disregard or callous indifference to Plaintiffs' federally protected rights when he terminated Plaintiffs' employment in violation of their First Amendment rights, Plaintiffs also seek punitive damages against Butler in his individual capacity as provided by 42 U.S.C. § 1983.

<u>CAUSE OF ACTION NO. 2</u>
**Defamation Against Defendant Butler by Plaintiff Senegal and Plaintiff Joubert**

29.     Paragraphs 1 through 28 of this First Amended Complaint are incorporated herein by reference as if fully set forth.

30.     In August 2004, Defendant Michael Butler intentionally or negligently published false statements of material fact to the Texas Commission on Law Enforcement Standards and

Education regarding Plaintiff Senegal that constituted defamation per se.  Specifically, Butler told the Texas Commission on Law Enforcement Officer Standards and Education, the peace officer's licensing agency in Texas, that Senegal was fired from his job for "official misconduct."  This statement was untrue and has damaged Senegal in his office, business, profession, or occupation in that it has prevented him from obtaining substantially equivalent employment as a peace officer, despite numerous attempts to do so.  The publication of this defamatory statement continues through Senegal's compelled self-publication of the reason he was provided as to why his employment was terminated. Senegal has suffered actual and consequential damages, mental anguish, humiliation, loss of enjoyment of life, lost employment benefits, past and future lost wages, past and future diminished earning capacity as well as special damages.  Because Defendant Butler has, by clear and convincing evidence, acted with actual malice or fraud with respect to the harms discussed herein, Senegal is entitled to and requests an award of punitive damages in accordance with Chapter 41 of the Texas Civil Practice & Remedies Code.

31.     Defendant Michael Butler intentionally or negligently published false statements of material fact to the Texas Commission on Law Enforcement Standards and Education regarding Plaintiff Joubert that constituted defamation per se.  Specifically, Butler told the Texas Commission on Law Enforcement Officer Standards and Education, the peace officer's licensing agency in Texas, that Joubert was fired from his job for "official misconduct."  This statement was untrue and has damaged Joubert in his office, business, profession, or occupation in that it prevented him from obtaining substantially equivalent employment as a peace officer during the time he was out of work, despite numerous attempts to do so.  The publication of this defamatory statement continues through Joubert's compelled self-publication of the reason he was provided

- 14 -

as to why his employment was terminated.   Joubert has suffered actual and consequential damages, humiliation, loss of enjoyment of life, lost employment benefits, past and future lost wages, past and future diminished earning capacity as well as special damages.   Because Defendant Butler has, by clear and convincing evidence, acted with actual malice or fraud with respect to the harms discussed herein, Joubert is entitled to and requests an award of punitive damages in accordance with Chapter 41 of the Texas Civil Practice & Remedies Code.

**E.**
**JURY DEMAND**

32.    In accordance with FED. R. CIV. P. 38(b), Plaintiffs demand a trial by jury on all issues triable to a jury and tender the requisite jury fee (if any) contemporaneously with the filing of this Original Complaint.

**F.**
**PRAYER**

WHEREFORE, Plaintiffs respectfully requests that upon trial on the merits, the Court award Plaintiffs the following relief:

1.    Compensatory damages for Plaintiffs' past and future pecuniary losses, humiliation, inconvenience, and loss of enjoyment of life as provided by 42 U.S.C. § 1981a(a)(1) and 42 U.S.C. § 1981a(b)(3);

2.    Equitable remedies of back pay, lost fringe benefits, lost retirement benefits and reasonable amounts for increases, and front pay in lieu of reinstatement;

3.    Punitive damages against Defendant Butler in his individual capacity as provided by 42 U.S.C. § 1983, the common laws of the state of Texas and Chapter 41 of the Texas Civil Practice & Remedies Code;

4.    Attorney's fees, costs and expert fees as provided by 42 U.S.C. § 1988;

5.    As to Plaintiffs Senegal and Joubert, an additional award of actual and special damages and punitive damages for Butler's defamation *per se*;

6.    Prejudgment and post judgment interest on these amounts where allowed by law and in the maximum amounts permitted by law; and

7.    All other relief, both in law or in equity, to which Plaintiffs may otherwise show themselves entitled.

Date:    August 22, 2005                     Respectfully submitted,

OF COUNSEL:                              By: _____

SCHMIDT & HOFFER LLP
A Registered Limited Liability Partnership

    - and -

**Kenneth Tribuch**
Texas Bar No.  24042539
S.D. Tex. I.D. No. 579059

**Stewart Hoffer** (Attorney in Charge)
Texas Bar No. 00790891
S. D. Tex. I.D. No. 20123
1111 Bagby, Suite 2000
Houston, Texas 77002
(713) 651-0771 (Telephone)
(713) 651-0776 (Facsimile)
shoffer@schmidt-hoffer.com (email)

**ATTORNEYS FOR PLAINTIFFS**

- 16 -